IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RONNIE H. HOVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:09CV486-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Ronnie H. Hovey brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a decision by the Commissioner of Social Security ("Commissioner")

denying his application for disability insurance benefits under the Social Security Act.  The

parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28

U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court

concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff was born on February 22, 1948. (R. 144).  He is a college graduate with a

master's degree, and with past relevant work as a high school teacher. (R. 30).  He was last

insured on September 30, 2003 and was 55 years old at that time. (R. 183).  On April 12,

2006, two and a half years after his date last insured, plaintiff filed an application for Social

Security disability insurance benefits (DIB) alleging disability since January 15, 2001, due

to his heart condition, asthma, stent placement, diabetes, neuropathy, and cardiac

defibrillator. (R. 187).   After his claim was denied, plaintiff requested a hearing before an

ALJ. Administrative Law Judge David R. Murchison conducted an administrative hearing

on January 16, 2008. On February 22, 2008, the ALJ issued a decision concluding that while,

during the relevant time period, plaintiff had severe impairments of asthma, coronary artery

disease, arthritis of the knee and ischemic cardiomyopathy, he retained the residual

functional capacity to perform his past relevant work as a teacher as that job is performed in

the national economy and, thus, that he was not disabled under the Social Security Act.  The

Appeals Council denied Plaintiff's request for review on March 25, 2009.  Accordingly, the

decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145.

Factual findings that are supported by substantial evidence must be upheld by the court.  The

ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985

F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## EVIDENCE

### Plaintiff's Cardiac Condition

Plaintiff quit his job as a high school teacher in August 1995, after he suffered a heart attack during a teacher's meeting on his first day of work for the school year.  (Plaintiff's hearing testimony, R. 30-31; see also R. 341).  In December of that year, plaintiff reported to Dr. Prophet, his pulmonary specialist, that he had experienced a "good Fall," and that a graded exercise test two weeks previously had revealed no suggestion of re-occlusion or other new problems. (R. 515).  In October 1998, he told Dr. Prophet that he was "having no angina or symptoms of heart failure" and that he had recently had a thallium graded exercise test "which apparently, was unremarkable." (R. 507).  In May and November 1999 and May 2000, plaintiff reported to Dr. Prophet that he was having no symptoms of angina or heart failure; he indicated that his cardiology follow-ups had been uneventful. (R. 504-06). Plaintiff's cardiologist, Dr. Craven, concluded during an office visit on July 31, 2000 that, "[f]rom a cardiovascular standpoint, [Plaintiff] remains stable without symptoms of chest discomfort, congestive heart failure or recognized arrhythmia." He noted "a recent exacerbation of [plaintiff's] asthma with marked improvement with Prednisone therapy." He wrote that plaintiff was "doing well at the present time" and scheduled him for follow-up in nine months or as needed.  (R. 543-44).  At the nine-month follow-up visit in late April 2001, plaintiff complained of some "recent wheezing," but no chest discomfort or

palpitations.  Dr. Craven wrote that plaintiff's "cardiovascular status appears stable at the current time," and scheduled plaintiff to return in one year or as needed.  (R. 542).  When plaintiff returned for follow-up in April 2002, Dr. Craven noted, "He has done very well since last being seen with no symptoms of chest discomfort or palpitations.  Hospitalization was required secondary to bronchospasm due to his underlying asthma.  However, he has had improvement in his symptoms over the past three weeks with no significant dyspnea." Again observing that plaintiff was "doing well at the current time," Dr. Craven scheduled plaintiff to follow up in one year or as needed.  (R. 541).  Dr. Craven next evaluated plaintiff after another one-year interval, on April 28, 2003.  He wrote, "He has done very well since last being seen except for some ongoing problems with asthma. He describes having fairly frequent episodes of dyspnea associated with wheezing." Dr. Craven again advised plaintiff to follow up in one year or sooner, if required.  (R. 540).

Just over two months later, on July 3, 2003, plaintiff had a heart catheterization after he experienced recurrent angina. The catheterization revealed significant stenosis in the posterolateral branch of plaintiff's left anterior descending artery.  He had a stent placed at that time, and was discharged two days later, on July 5, 2003.  (R. 337, 363, 394, 489, 539).[1] At a follow-up visit with Dr. Craven on July 31, 2003 – two months before his date last insured – plaintiff reported that he had "done well since last being seen with improvement

_____

[1]  This history is included in notes of treatment on July 31 and August 4, 2003  and in February, October and November 2005.  Plaintiff did not provide his July 2003 inpatient treatment records.

4

in his symptoms of dyspnea." Dr. Craven noted, "He has had no symptoms of chest discomfort. He denies tachypalpitations. Overall he is very content with his current state of health." Dr. Craven scheduled plaintiff to return in six months or sooner, if needed. (R. 539). In August 2003, plaintiff reported to Dr. Morriss that he "feels better since he has had this [catheterization and stenting] th[a]n he has felt in a while." (R. 547). At plaintiff's next follow-up visit to his cardiologist on February 19, 2004 – almost five months after plaintiff's date last insured – Dr. Craven noted, "He has done well since last being evaluated with no significant symptoms of chest discomfort, shortness of breath or tachypalpitations." (R. 418). At a follow-up visit thirteen months later, on March 31, 2005, plaintiff denied "any problems with chest discomfort, shortness of breath, or tachypalpitations," and was "content with his current status." Dr. Craven noted, "Overall, [plaintiff] is doing very well at the current time." (R. 417).

In October 2005 – two years after his date last insured – plaintiff again experienced some chest discomfort. He first saw his primary care physician, Dr. Morriss, and was referred for a Cardiolite stress test which was abnormal. Dr. Craven performed a diagnostic cardiac catheterization on October 26th, which revealed severe left ventricular systolic dysfunction and nonobstructive atherosclerotic coronary artery disease. (R. 307-35, 416). Dr. Craven referred plaintiff to Dr. Pinson, another cardiologist in his practice, for evaluation and implantation of a prophylactic cardioverter-defibrillator. "Because of his otherwise reasonably good health status and young age," and his high risk for future sudden cardiac death, Dr. Pinson recommended that plaintiff proceed with the implant. (R. 343-44). On

5

November 16, 2005, Dr. Pinson implanted the cardioverter-defibrillator. Plaintiff remained in the hospital overnight for observation, and was discharged the following day. (Exhibit 5F, R. 336-60). Plaintiff returned to Dr. Pinson on December 20, 2005 for a follow-up appointment. Dr. Pinson noted that plaintiff was "stable from a cardiac perspective" and "has not had angina, symptoms of arrhythmia or overt symptoms of congestive heart failure." Dr. Pinson determined that the implanted device was functioning normally, and he advised plaintiff to return in six months for follow-up. (R. 383-84).[2]

At an office visit with Dr. Craven on March 30, 2006, plaintiff reported that he had "done well since last being seen, having no significant symptoms of chest discomfort, shortness of breath or tachypalpitations." Dr. Craven noted that "[o]verall, he is content with his current status." (R. 414). Dr. Craven concluded after his examination that "[plaintiff] is doing very well at the present time." He asked plaintiff to return to him for follow-up "in approximately six months." (R. 415).

On June 26, 2006, plaintiff returned to Dr. Pinson for his six-month check-up on the cardiac device. Dr. Pinson again noted that, while plaintiff's COPD remained a "significant factor," plaintiff was "stable from a cardiovascular perspective," and had not manifested congestive heart failure. On analysis of plaintiff's implanted device, Dr. Pinson noted two instances of ventricular tachycardia – one on December 31, 2005 and the second on April 24, 2006 – terminated by the initial burst from the device; plaintiff was unaware of the

---

[2] Dr. Pinson noted plaintiff's readmission to the hospital by the pulmonary service due to exacerbation of his asthma. (R. 383).

arrhythmia.  (R. 438-39).

On plaintiff's six-month follow-up appointment with Dr. Craven on October 30, 2006, plaintiff reported "infrequent episodes of angina with excessive activity," but no dsypnea or tachypalpitations. After examination, Dr. Craven noted that plaintiff was "doing very well[.]" He again scheduled plaintiff for six-month follow-up.  (R. 437). At his cardiac device follow-up on January 4, 2007, Dr. Pinson found that "[n]o ICD detection or therapy deliveries occurred." Dr. Pinson recorded, under "interim history," that "[o]n return to clinic, he remains stable from a cardiovascular perspective.  He has not manifested overt [congestive heart failure].  His limiting factor at present continues to be his COPD. . . . He has not had significant angina."  (R. 435-36).

At his routine follow-up with Dr. Craven on April 30, 2007, plaintiff reported that he had "done very well since last being seen, having no symptoms of chest discomfort, shortness of breath, or tachypalpitations" and no defibrillator discharges.  Dr. Craven examined plaintiff and noted, "Overall [he] is doing well at the present time."  He scheduled plaintiff for follow-up in six months. (R. 434).  At plaintiff's check-up on July 19, 2007, he reported that he had not had significant angina or symptoms of congestive heart failure.  He indicated that "[h]is COPD is stable at this time, which has been a primary limiting factor." Dr. Pinson determined that the cardiac device had documented no ventricular tachycardia, and that "no ICD therapy deliveries [had] occurred."  (R. 432-33).  Plaintiff returned to Dr. Pinson several weeks later, because he believed that he had "sustained an ICD discharge on

7

9/17/07."[3] Dr. Pinson checked the device and confirmed that it was functioning normally and that there had been "[n]o interim ICD detection or therapy deliveries." He scheduled plaintiff for follow-up in six months. (R. 430-31).

<u>Plaintiff's Asthma</u>

Dr. Dale Prophet of Pulmonary Associates has treated plaintiff for over twenty years, since February of 1987, for his asthma. (Exhibit 17F).[4] In February 1987 – eight and a half years before plaintiff quit working as a teacher – plaintiff reported asthma for the previous ten to twelve years, with worsening symptoms over the previous four to six weeks, with coughing and wheezing at night and occasional spells during the day. Dr. Prophet noted, "The patient has had asthma which has been fairly well controlled albeit on daily steroid therapy, but over the last few weeks he has become worse with increasing signs of increasing bronchial irritability." Plaintiff was then taking five milligrams of Prednisone and 600 milligrams of Theophylline daily, using an Intal Spinhaler four times and a Ventolin inhaler three times each day. Dr. Prophet increased plaintiff's Prednisone to 40 milligrams, "tapering by 5 mg. back to 5 mg. a day." At his follow-up appointment a few weeks later, plaintiff was largely asymptomatic, having only a slight cough with clear sputum, and Dr. Prophet assessed him as "greatly improved." Dr. Prophet prescribed Prednisone (5 mg), increased

---

[3] Plaintiff also reported this defibrillator discharge to Dr. Morriss on September 24, 2007. (R. 444).

[4] The treatment notes in Exhibit 8F are duplicates of notes included in Exhibit 17F.

the Theophylline to twice daily, and both inhalers to four times each day.  (R. 535-37).[5]

Plaintiff next returned six months later, in September 1987, when he experienced a "mild

flare of his asthma."  He was still on Prednisone.  Dr. Prophet again prescribed a Predisone

taper from 40 milligrams down to 5 mg each day, followed by a reduction to 5 mg every

other day for a month and, if plaintiff was then stable, discontinuing the Prednisone.  (R.

534).  Plaintiff's asthma was stable on follow-up in December 1987, with plaintiff  "doing

rather well with no major problems," but still taking Prednisone, which Dr. Prophet advised

him to discontinue. (R. 533).  He had a flare-up in May 1988, and was prescribed another

Prednisone taper, which got his symptoms under control. He was doing "fairly well" in

November 1988 with some minor problems which Dr. Prophet thought might be due to dust

and pollen. (R. 531-32).  Plaintiff called in for another Prednisone taper in April 1989 and

felt better, but still had some "very mild dysfunction" by June, so Dr. Prophet prescribed

another Prednisone taper.  (R. 530).

   Dr. Latimer saw plaintiff on November 1, 1989, after he had experienced a "severe

episode of bronchospasm" requiring intravenous therapy in the hospital.  His spirometry just

before his discharge from the hospital "showed only mild obstruction." Dr. Latimer assessed

---

  [5]  At this visit, plaintiff also reported "[a]rthritis of the knees." (R. 535).  Dr. Prophet's
treatment notes all include a problem list, or references back to earlier lists, to which Dr. Prophet
added other problems as they developed, but from which he did not remove anything. The list or
reference back was always proceeded by the statement, "[Plaintiff] comes in for evaluation of the
following problems[.]"  While Dr. Prophet recorded plaintiff's history, including medical problems
unrelated to asthma (see *e.g.*, R. 523, including "[p]ossible carpal tunnel syndrome, right hand,
resolved"), and performed physical examinations, he actually treated plaintiff only for his asthma.
(R. 475-537).

"[r]esolution of acute symptoms." (R. 529). At his next office visit seven months later, Dr. Prophet noted that Plaintiff required Prednisone tapers in mid-November, early April, and mid-May, but that he had "done fairly well since his hospitalization in October[.]" Plaintiff was then "out of school and working outdoors without problems." (R. 528). In October, plaintiff was again hospitalized for a "flare-up of his asthma." Dr. Prophet assessed him as "stable" on October 22, 1990. (R. 527). In December, plaintiff reported that he was "doing well with no problems with his asthma over the last two months[,]" and Dr. Prophet again assessed his asthma as stable. (R. 526).

At a follow-up six months later, in June 1991, Dr. Prophet noted that plaintiff had required a prescription for Prednisone for a flare-up six weeks earlier. Plaintiff also reported "a little flare-up in early February as well as mid March[,]" but that he had otherwise "done reasonably well the last six months. (R. 525). At his next follow-up in December 1991, he remained stable, having had a "fairly benign summer and fall with only one flare-up requiring a tapered Prednisone course." (R. 524). Over the next two and a half years, plaintiff had routine six-month check-ups; he remained stable, with occasional flare-ups which resolved with antibiotics and steroid tapers. (R. 519-23).

On August 4, 1994, plaintiff returned to Dr. Prophet for evaluation after "having had trouble most of the month of July," including treatment by antibiotics and steroids two weeks earlier. Dr. Prophet prescribed a Prednisone taper, starting at 60 milligrams. In December 1994, plaintiff reported "doing reasonably well over the last four months[,]" with a "little flare-up in mid October" which responded to a tapered course of Prednisone. At his six-

month follow-up appointment on June 26, 1995, plaintiff reported "having had a pretty good

six months. Dr. Prophet wrote:

> He had one flare-up of his asthma in late March for which we gave him a
> tapered course of Prednisone. He has noted occasional spells of some
> shortness of breath at night but generally has done fairly well. This past
> Thursday night he woke up rather short of breath and it took quite some time
> for this spell to pass. This, he thinks, was just due to stress as his bookkeeper
> walked out and quit on him that day. He had two weddings to do and was just
> under a lot of pressure. Otherwise, [plaintiff] has done reasonably well.

(R. 516). Dr. Prophet assessed plaintiff as "stable," but indicated that "he needs some

Prednisone to have on hand in case he has another spell like this." He scheduled plaintiff for

a six-month follow-up. (Id.).

Several weeks later, in August 1995, plaintiff had a heart attack. (R. 30-31). He

returned to Dr. Prophet on December 27, 1995, reporting "a good Fall" after his heart attack.

Dr. Prophet assessed him as stable, and noted, "He decided to retire from teaching after the

heart attack and is now just doing his florist shop business." (R. 515). Plaintiff thereafter

remained stable through June of 1997, with occasional flare-ups (most recently in March and

May) requiring bursts of Prednisone. (R. 512-14).

In the five or six months leading up to October 1997, he had five or six rounds of

Prednisone, which Dr. Prophet described as "a bit more unstable pattern for him." Dr.

Prophet thought that it might be because plaintiff was remodeling his house during this time.

Plaintiff was hospitalized by Dr. Sherrer in early October due to an exacerbation of his

asthma. On October 20, 1997, Dr. Prophet noted that plaintiff had been on 40 mg of

Prednisone for a week and was "improved." He prescribed tapering the Prednisone and

scheduled plaintiff to return in December. (R. 511). In early December, plaintiff had another flare-up requiring a Prednisone taper from 60 mg. Dr. Prophet changed plaintiff's Vanceril prescription to Flovent. By December 22, 1997, he was "doing very well." Dr. Prophet decided to keep plaintiff on the Flovent, "given his instability the last few months." (R. 509-510).

Plaintiff did not again return to Dr. Prophet for ten months. On October 18, 1998, Dr. Prophet noted that since his last visit plaintiff had "required no Prednisone whatsoever" was "clinically doing quite well." (R. 508). Plaintiff next returned to Dr. Prophet in May 1999, "having done very well" over the previous several months. Dr. Prophet noted plaintiff's flare-up of asthma in late March, "the first flare-up he has had in about a year and a half," and assessed him as "stable and doing well." (R. 506). By his follow-up in November 1999, he was "stable and doing very well overall," with no flare-ups since the one in March. (R. 505). On April 7, 2000, plaintiff sought treatment from Dr. Mirarchi at PrimeCare for his cough, scratchy throat, nasal congestion, and a wheeze which got worse in the evenings. Dr. Mirarchi treated plaintiff twice with a nebulizer and gave him a shot at the office; he prescribed medications. At a follow-up appointment at PrimeCare two weeks later, plaintiff told Dr. Sherrer that he continued to have nasal discharge, sneezing and sinus drainage. Dr. Sherrer prescribed a steroid nasal spray and Allegra-D. (R. 575, 578-79). At plaintiff's May 2000 follow-up, Dr. Prophet noted the episode for which plaintiff had received two aerosol treatments from Dr. Sherrer's office. He further observed that plaintiff had called in for Prednisone prescriptions two or three times; Dr. Prophet thought it was necessitated by "the

excessive dryness" that spring.  Dr. Prophet noted, "[Plaintiff] overall is doing fairly well."

(R. 504).  In mid-June, plaintiff was treated by Dr. Mirarchi for an asthma flare-up and was

prescribed a home nebulizer.

On June 23, 2000, Dr. Sherrer noted that plaintiff had done well since the treatment;

plaintiff had no complaints of asthma at a follow-up two weeks later.  (R. 576-78). Plaintiff

had "a severe attack of bronchospasm" just before Thanksgiving; he went to the emergency

room where he was "treated aggressively and cleared after several hours and went home on

a tapering course of Prednisone."  He had finished the steroid course by the time of his

December 15, 2000 follow-up with Dr. Prophet and was, by then, "symptom-free[.]"  Dr.

Prophet then noted that plaintiff was "stable overall and doing rather well."  (R. 503).  At a

follow-up appointment with Dr. Sherrer on January 15, 2001 – plaintiff's alleged onset date

– plaintiff stated that he was "doing well" as to his asthma, heart disease and hypertension.

Dr. Sherrer wrote that plaintiff was "having no chest pain, cardiac symptoms, respiratory

distress, or other abnormalities except for raised skin lesion to the left forearm."  (R. 574).[6]

On March 20, 2001, Dr. Sherrer treated plaintiff for sinus congestion, headache and post-

nasal drip.  (R. 572).

At plaintiff's six-month follow-up appointment on June 26, 2001, Dr. Prophet

indicated "[the plaintiff] had an up and down six months with several mild-to-moderate

exacerbations of the asthma, at least one of which required an emergency room visit in

---

[6] This lesion was diagnosed as squamous cell carcinoma on January 30, 2001; plaintiff had
a skin graft sometime between mid-February and mid-March.  (R. 59, 572-73).

April." (R. 502).  Dr. Prophet wrote, "The biggest stress however has been the deteriorating health of his mother who continues to live up in Barbour County so [plaintiff] is driving up there frequently, spending the night, helping with her and plus doing his full time job here." Dr. Prophet concluded that the plaintiff was fairly stable overall, and stated, "As I discussed with him I suspect the stress of his lifestyle is causing some aggravation of his asthma.  The sinus problem [mild sinus drainage] may be a contributing factor as well." (R. 502).  The following day, plaintiff returned to Dr. Sherrer for follow-up.  Dr. Sherrer wrote, "States that he has had some allergy symptoms and some sinus drainage over the past several weeks.  The patient has had no other complaints.  States that he is doing well and has followed up with both of his consultants specifically Cardiology and Pulmonology and has been given clean bills of health." (R. 572).  On October 22, 2001, plaintiff sought treatment from Dr. Sherrer for increased wheezing and shortness of breath over the past one to two weeks, which he reported initially began as sinus congestion and drainage. Plaintiff received a shot of Decadron and Depomedrol and used an Albuterol nebulizer twice in the office. The "[w]heezing essentially resolved post treatment." Plaintiff returned the following day as directed, and said that he was feeling much better. He denied "any shortness of breath or breathing difficulty or wheezing." (R. 569-70).

Plaintiff returned to Dr. Prophet for his six-month follow-up two months later, on December 27, 2001.  Dr. Prophet noted that plaintiff was "doing reasonably well but has had a little more trouble this fall than usual with the need for three rounds or so of Prednisone. . . . He is under a lot of stress with dealing with his mother's health problems

14

along with the usual flurry of business activities and this may be contributing somewhat to his problems."  Dr. Prophet concluded that plaintiff was "having some instability in his asthma."  He prescribed a prolonged Prednisone taper, noting that "if that were to fail to get it under control, we might consider adding a leukotriene inhibitor.  Stress reduction would probably help as well."  (R. 501).  At a routine check-up with Dr. Sherrer on January 10, 2002, plaintiff stated that he "feels well" in general.  He denied any shortness of breath or breathing problems, "other than his chronic pulmonary status."  (R. 568).  A week later, on January 17, 2002, Dr. Prophet noted that plaintiff was "much improved" and "doing well." (R. 500).  In February 2002, while he was still tapering his Prednisone, he "got around some heavy Clorox fumes which caused severe bronchospasm," and he "bumped his Prednisone back up to 40 mg and has tapered it back down to [10 mg]."  Dr. Prophet noted, "There is also some stress with Valentine's Day activities which may have aggravated his breathing as well."  By February 21, 2002, he was "breathing fairly well" and "feeling well," and he was "having no nocturnal dyspnea or cough."  (R. 499).

On March 21, 2002, Dr. Prophet noted that plaintiff was then "stable" but had been hospitalized for a few days in late February and early March "with exacerbation of his asthma which did not respond to higher dose Prednisone or treatment at the emergency room." By the time of his office visit, he was "breathing quite well but still note[d] a generalized sense of fatigue." (R. 498).  On April 10, 2002, plaintiff told Dr. Sherrer that he was "doing well and is having no complaints" and "no respiratory distress."  (R. 567).  At a follow-up with Dr. Prophet eight days later, plaintiff was "feeling well, having regained

15

most of his endurance[,] and reported "no cough, sputum, wheezing, chest pain or other problems off of Prednisone." Dr. Prophet noted that he "is stable and doing quite well." (R. 497). On July 22, 2002, plaintiff reported to Dr. Sherrer that he "feels well" and he denied any chest pain, palpitations, shortness of breath or breathing difficulties. (R. 566).[7] On July 31, 2002, plaintiff had some "sinus stuffiness and mild sinus drainage" which Dr. Prophet wanted to treat symptomatically; he planned to obtain a CT of the sinuses if plaintiff's symptoms persisted. Dr. Prophet noted that plaintiff was "generally stable," and that he had done "reasonably well with his asthma" with a "little flare-up earlier this month" which had resolved with a burst of Prednisone. (R. 496).

Plaintiff returned for evaluation on August 19, 2002. Dr. Prophet wrote:

> [Plaintiff] comes in after having been seen in the emergency room last week with an exacerbation of his asthma. This began about eight days ago after eating a lot of snow crab legs on a Saturday evening. [He] has noted a little bit of wheezing when he ate shrimp and has stopped eating shrimp but unfortunately has continued to eat the snow crab. He called us last Monday but continued to deteriorate and finally went to the emergency room where he received a tapered course of steroids which he finished two days ago and now is breathing quite well. This exacerbation is not associated with any sinus problems. . . . [He] appears to have recovered from the flare of asthma. I suspect this is due to an iodine sensitivity and not due to sinus problems.

(R. 495). Two months later, in October 2002, plaintiff was hospitalized "with an exacerbation of his asthma provoked in part by his sinuses." (R. 494). He developed significant hyperglycemia in the hospital due to the steroids used to treat his asthma. (R. 494, 550-51).

---

[7] Plaintiff reported some new skin lesions for which Dr. Sherrer referred him to Dr. Pynes, a dermatologist. (R. 566).

Dr. Morriss, plaintiff's primary care physician at Southern Clinic, saw the plaintiff on October 21, 2002, for a post-hospitalization follow-up.  Dr. Morriss wrote, "[Plaintiff] is doing much better with his breathing and is followed by Dr. Dale Pro[phet] for this problem. He has, otherwise, done fairly well."  Dr. Morriss noted that the plaintiff had "Type II diabetes mellitus, recently exacerbated by corticosteriods."  (R. 550-51).  Plaintiff saw Dr. Prophet the following day.  Dr. Prophet noted that plaintiff was off of the Prednisone and his blood sugar was under good control with diet and Amaryl 1 mg daily.  Dr. Prophet wrote that plaintiff's "breathing is doing quite well" and that he was "much improved."  (R. 494).

Plaintiff did "quite well" for the next three months, requiring no interventions until he experienced some increased wheezing caused by the intense cold weather in mid-January 2003.  He told Dr. Prophet on January 23, 2003 that his blood sugars were "doing well."  Dr. Prophet prescribed a Prednisone taper to get plaintiff's increased bronchospasm under control.  (R. 493).  Plaintiff "had some problems off and on through the spring with his asthma," requiring a couple of rounds of Prednisone.  In late April, he told Dr. Prophet that he recovers quickly but relapses when he stops the Prednisone, and that his total cholesterol and blood sugar levels had done well.  Dr. Prophet wrote, "[Plaintiff] has suboptimally controlled asthma.  I think we need to resume empiric antibiotics for probable sinus disease, as well as a little bit of low dose Prednisone.  (R. 492).  A month later, Dr. Prophet noted that plaintiff was "doing fairly well but still having some nocturnal symptoms."  He noted that plaintiff's blood sugars had been well controlled and his cholesterol checks satisfactory, and he continued plaintiff on his current dose of Prednisone. (R. 491).

17

Plaintiff did "rather well" for the next month, until "getting out in a pea patch which resulted in some increased congestion for which he briefly boosted his Prednisone to 30 mg and then tapered very quickly back to his present dose." Dr. Prophet noted that "[h]e otherwise has done well with no major nocturnal symptoms" and that he was "stable overall." (R. 490). Plaintiff next saw Dr. Prophet just over a month later, after his hospitalization in July 2003 for cardiac catheterization and stent placement. Dr. Prophet noted that he was "stable as far as his asthma is concerned." (R. 489). In October 2003, two weeks after plaintiff's date last insured, Dr. Prophet wrote:

> [Plaintiff] comes in getting along fairly well for this time of year. He has noted a little bit of increased wheezing in the last few weeks and increased his Prednisone to 10 mg a day for about a week and then has been on 5 mg a day for about a week, and this has resulted in good breathing. He is having no angina. Otherwise he has noted no unusual problems and states he has really done better over the last few months than he has in some time with the every other day Prednisone and also since his other stent was placed in July.

(R. 488). Dr. Prophet noted that since plaintiff was "fairly stable" he could "go back to every other day Prednisone after another week or two, and then if he is doing extremely well late in November he may want to try stopping the Prednisone." (Id.).

On January 6, 2004, plaintiff reported that he had done "fairly well over the last two or three months" and had stopped the Prednisone for about three weeks, until he had some trouble the week before Christmas and "boosted it back up[.]" He was then on 5 mg daily and was "breathing fairly well." Dr. Prophet noted that he was "having no angina or symptoms of heart failure and otherwise has felt well." Dr. Prophet wrote, "[He] is stable. I think he will need to maintain Prednisone at a very low dose indefinitely. Hopefully this can be done

18

with an every other day regimen." (R. 487).  In late March 2004, plaintiff reported problems for the preceding four or five days with increased wheezing, after a 24-hour episode of gastroenteritis.  Dr. Prophet noted, "Also, there were some issues related to his mother and the stress of that also tends to cause him to have some wheezing. He has had no major sinus problems and states otherwise he has been doing quite well with 5 mg every other day Prednisone along with his other multiple medications. Recent laboratory regarding his cholesterol, etc., had been satisfactory and his blood sugars have done well."  Dr. Prophet increased plaintiff's Prednisone to 60 mg for two days followed by a rapid taper back to the baseline dose.  (R. 486).

> Two months later, on May 28, 2004, Dr. Prophet wrote:
>
> [He] comes in much improved after higher dose of Prednisone now maintaining at 5 mg daily.  He has had no nocturnal wheezing or cough.  He had minimal if any daytime symptoms.  He notes no angina or symptoms of heart failure.  Blood sugars are satisfactory.  Some improvement may be due to the placement of his mother and disabled older brother in a nursing home and that transition seems to have gone quite well thus relieving a lot of mental and physical stress on [plaintiff].

(R. 485).  Dr. Prophet noted that plaintiff was "doing quite well on his current medical regimen."  (Id.).  Dr. Prophet saw plaintiff six times over the next year and a half, during which plaintiff did well, reporting no angina or heart problems and good control of his blood sugar, with occasional "mild" or "little" flare-ups of his asthma.  (R. 479-84).  Plaintiff had an exacerbation of his asthma on December 12, 2005, three weeks after his cardiac defibrillator was implanted, precipitated by an upper respiratory infection.   Dr. Prophet noted that the exacerbation "may or may not be able to be treated successfully as an

19

outpatient" and that, "[g]iven his tenuous cardiac status, I feel it is safest to have him in as an observation patient." He admitted plaintiff to the hospital overnight "to receive a couple of doses of IV (intravenous) steroids and continued aerosols along with his other routine medicines," with a plan to discharge him the following day if he was stable. On December 13, 2005, plaintiff was discharged from the hospital. (Exhibit 6F, R. 361-382). Two months later, Dr. Prophet noted that he had "done well since [the brief hospitalization]" and was "stable." (R. 479).

Dr. Prophet saw plaintiff four times over the next eighteen months, during which plaintiff did well generally, except for several weeks of nasal stuffiness in early 2007 which led to worsening asthma symptoms, followed by a bout of gastroenteritis. Otherwise, plaintiff had occasional flare-ups of asthma requiring bursts of Prednisone but no "major interventions." (R. 475-78; see also R. 456, March 2006 visit to Dr. Morriss).

Plaintiff's Neuropathy

On May 31, 1999, plaintiff was referred to Dr. Steven Sykes of the Southeast Alabama Medical Center pain clinic for his complaints of "a two year history of a burning dysesthesia-like pain of both feet[,]" in the soles of both feet and on the top and bottom of all of his toes. (R. 79-80). EMGs and nerve conduction studies in January 1999, a thoracic spine MRI, and a glucotrol study had all been negative. After obtaining a lumbar MRI, Dr. Sykes believed that plaintiff's symptoms were consistent with "a bilateral L5 radiculopathy secondary to neural foraminal canal stenosis." (R. 82, 106; see also R. 101). Dr. Sykes performed bilateral selective nerve root blocks, and bilateral L5-S1 facette joint injections on June 7, 1999 and

20

started him on Celebrex. The treatments gave plaintiff no significant relief, leading Dr. Sykes to conclude that foraminal stenosis of L5, L5-S1 hypertrophy, and peripheral neuropathy were excluded as sources of plaintiff's pain. Dr. Sykes performed a diagnostic lumbar epidural steroid injection on June 30, 1999 to rule out the possibility of central canal stenosis. This also failed to give plaintiff any relief. Dr. Sykes concluded that plaintiff did not have central cord pathology or peripheral neuropathy, and thought that plaintiff's pain might be caused by a musculoskeletal etiology or, possibly, "a local peripheral neuropathy at the leve[l] of the ankle or below."  He recommended that plaintiff be evaluated by a podiatrist. (R. 82-94).

Several months later, on January 20, 2000, plaintiff saw Dr. Sherrer at PrimeCare for a three-month check-up. He reported continued paresthesias of both feet which had not responded to medications prescribed by Dr. Sherrer and two neurologists. Dr. Sherrer referred plaintiff for orthopedic evaluation.  (R. 580).[8]  On February 9, 2000, plaintiff was evaluated by Dr. David Alford at Southern Bone and Joint Specialists. Plaintiff told Dr. Alford that his feet were not actually painful, but "burning."  He had a non-antalgic gait and could heel walk and toe walk without difficulty.  His hind foot alignment, range of motion, strength and stability were normal, and he had +3 reflexes in both the knee and ankle. Compression at the tarsal tunnel increased plaintiff's burning sensation from a 5/10 to 6/10 bilaterally. Dr. Alford diagnosed peripheral neuropathy, and gave plaintiff some arch

---

[8]  Plaintiff sought treatment from Dr. Sherrer's office fifteen times after the January 2000 visit, until July 2002.  None of the other treatment notes reference foot problems.  ( R. 566-81).

supports and some Zostrix cream to desensitize his feet.  (R. 561-64).  Plaintiff was a "no

show" for follow-up visits scheduled with Dr. Alford for March 22, 2000 and April 3, 2000.

(R. 561).

The next treatment note of record regarding foot pain is dated December 8,

2003 – nearly four years after plaintiff was evaluated by Dr. Alford – when plaintiff sought

treatment from Dr. Morriss complaining of "left lower extremity pain for 24 hours."[9]  He told

Dr. Morriss that he awoke the previous day with the pain, and that it was a sharp, shooting

type of pain when plaintiff stood, and lessened to a "sore" type of pain when he was seated.

(R. 408).  On March 10, 2004, Dr. Morriss noted that plaintiff "didn't get much help with the

Elavil at 50 mg for his burning paresthesias of his feet.  Dr. Morriss talked with plaintiff

about increasing the Elavil dosage and, if that did not work, trying Neurontin.  (R. 406).  In

July 2004, plaintiff reported that the increased dosages of Elavil had helped only a little.  Dr.

Morriss decided to try plaintiff on Mirapex before trying Neurontin.  (R. 405).  There is no

further mention of foot paresthesias or neuropathy in plaintiff's medical record until May 24,

2005, when he complained of it to Dr. Morriss; on July 26, 2005, Dr. Morriss noted that he

was "still [with] neuropathy.  (R. 392-93).[10, 11]

---

[9]  Plaintiff made no complaints of foot pain in his previous visits to Dr. Morriss on October 21, 2002, August 18, 2003 or November 21, 2003. (R. 410-11, 550-51).

[10]  Plaintiff sought treatment at Southern Clinic on October 22, 2004 for a flare-up of gouty arthritis in his left knee, which had resolved a week later  (R. 394, 397, 403), a few times in November for cellulitis in his right lower leg (R. 398-404), and on February 18, 2005 for a routine check-up by Dr. Morriss (R. 394-95).  The treatment notes for these office visits do not reference plaintiff's peripheral neuropathy or paresthesias. Between March 2006 and September 2007, Dr. Morriss saw plaintiff seven times for follow-up and lab work, and for evaluation and treatment of

# DISCUSSION

The ALJ found that, prior to his date last insured, plaintiff retained the residual functional capacity to perform a range of light exertional work, with work requiring occasional climbing; frequent balancing, stooping, kneeling, crouching, and crawling; but no exposure to extreme cold and heat; and dangerous heights or machinery. (R. 16). The ALJ wrote that the RFC is supported by, *inter alia*: the findings of Dr. Morriss between August 2003 and March 2004;[12] the assessments by Dr. Craven, plaintiff's cardiologist, in July 2000, April 2001, April 2002, and July 2003 and several months after the date last

---

additional problems including – at various times – shoulder, neck, back and right flank pain; sinusitis; and conjunctivitis but the records do not mention foot pain, paresthesias or neuropathy. (Exhibit 14F, R. 444-56).

[11] Plaintiff submitted records of eye examinations conducted by Dr. Danny Hartzog. Dr. Hartzog diagnosed allergic conjunctivitis and stable background diabetic retinopathy in both eyes in July 2002. (R. 585). In June 2003, he again noted early background diabetic retinopathy, with no treatment necessary. (R. 587). Dr. Hartzog saw plaintiff for check-ups, or complaints of red or itchy eyes in November 2003, October 2004, June 2005, and January 2006. (R. 589-595). In February 2006, he wrote to Dr. Morriss that plaintiff was myopic, but correctable to 20/25 in each eye, he had only background diabetic changes, no macular edema, and early nuclear cataracts, not reducing plaintiff's vision to the extent that surgery would be necessary in the foreseeable future. (R. 596). In May 2006, Dr. Hartzog completed a report of the January examination for the Disability Determination Services indicating that no treatment was required for plaintiff's minimal background diabetic retinopathy or his cataracts, and that no workplace precautions were indicated. (R. 419-20). In June 2006 treatment notes, he described plaintiff's diabetic retinopathy as mild and stable. (R. 597). In February 2007, he again indicated that no treatment was required for plaintiff's early, stable background diabetic retinopathy or his early cataracts. (R. 600). In August 2007, Dr. Hartzog noted mild macular edema, but stated that it was not clinically significant and that, as with plaintiff's background diabetic retinopathy and cataracts, no treatment was required. (R. 603).

[12] See R. 406-11.

insured;[13] the records of plaintiff's treating pulmonary specialist, Dr. Prophet, between December 2000 and January 2004;[14] and the observations and findings of Dr. Sherrer of PrimeCare of Dothan between January 2000 and July 2002.[15] (R. 14).  The ALJ also cited the plaintiff's "wide range of activities of daily living," including "taking care of [his] own personal needs without assistance, shopping with assistance if he has a large grocery load, cooking, performing housework, visiting with medically ill mother and disabled brother daily, taking care of his dog and driving[,] and by working at onset and after onset at below SGA level[.]" (R. 14). The ALJ concluded that, "[t]hrough the date last insured, the [plaintiff's] past relevant work as a teacher did not require the performance of work-related activities precluded by the [plaintiff's RFC]." (R. 24). The ALJ stated, "I find that the [plaintiff] can return to his past relevant work as a teacher, not as he performed it, but as that work is performed in the national economy." (R. 15).[16]

Plaintiff contends that the ALJ's conclusion that he retains the RFC to perform light work exertionally is not supported by substantial evidence. Plaintiff notes that the record

---

[13] See R. 418, 539-44.

[14] See R. 487-503.

[15] See R. 566-80.

[16] In his discussion of plaintiff's past relevant work, the ALJ cited DOT # 091.221-010 as the listing for High School Teacher. (R. 15, 24).  A review of the entire record indicates that this is a typographical error and that the ALJ intended to cite to DOT # 091.227-010.  During the hearing, the ALJ questioned a Vocational Expert and asked whether she was able to match the plaintiff's work as a high school teacher with any occupation listed in the Dictionary of Occupational Titles. (R. 43).  The Vocational Expert answered affirmatively and provided the ALJ with the listing for "teacher, secondary[,]" DOT 091.227-010.  (R. 43-44).  Plaintiff does not contend otherwise; he attaches this listing to his brief.  (Doc. # 13-3).

does not contain any opinions from any treating or examining physicians regarding plaintiff's work-related limitations, and that no state agency physician has reviewed the evidence.  He contends that the ALJ erred in relying on the physical RFC assessment of the state agency disability examiner, Patricia Easley, because: (1) Easley's RFC assessment was a "current assessment" as of June 2006, not intended to relate back to plaintiff's date last insured, and which did not take into account all of the evidence submitted after the initial denial; and (2) Easley is not a doctor.  Plaintiff further argues that the ALJ failed to consider the mental demands of his past work, and that the ALJ erred by failing to seek hearing testimony from a medical expert regarding whether plaintiff was disabled before his date last insured.

Plaintiff bears the burden of proving that he is disabled.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005)(citation omitted).  However, he provided no medical source statement indicating that he is incapable of performing light work.  In Green v. Social Security Administration, 223 Fed. Appx. 915 (11th Cir. 2007)(unpublished opinion), the Eleventh Circuit reviewed a decision in which the ALJ had properly discredited a treating source's opinion regarding the claimant's capabilities, and then – without a physical capacities evaluation from any other medical source – determined that the claimant retained the residual functional capacity to perform light work.  Finding that the ALJ's RFC determination was supported by substantial evidence, the Eleventh Circuit stated:

> Green argues that without Dr. Bryant's opinion, there is nothing in the record for the ALJ to base his RFC conclusion that she can perform light work. As mentioned previously, the burden lies with the claimant to prove her disability. Moore, 405 F.3d at 1211. In the fourth step of that analysis, the ALJ determines the claimant's RFC and her ability to return to her past relevant

work. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir.2004). In determining the claimant's RFC, the ALJ "must determine if the claimant is limited to a particular work level." Id. ... Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ. 20 C.F.R. §§ 404.1513, 404.1527, 404.1545.

\* \* \* \* \*

Green argues that once the ALJ decided to discredit Dr. Bryant's evaluation, the record lacked substantial evidence to support a finding that she could perform light work. Dr. Bryant's evaluation, however, was the only evidence that Green produced, other than her own testimony, that refuted the conclusion that she could perform light work. Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of the Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work.

Green, 223 Fed. Appx. at 923-924. The Eleventh Circuit's analysis in Green, while not controlling, is persuasive, and the court finds plaintiff's argument (see plaintiff's brief at pp. 11-12) that the ALJ erred by making a residual functional capacity finding without an RFC assessment from a physician without merit. In formulating plaintiff's RFC in the present case, the ALJ – like the ALJ in Green – relied on the office treatment notes of plaintiff's medical providers. See R. 14 ("That residual functional capacity is supported, inter alia, by the findings of Dr. Morris[s] in Exhibit 9F at 18-25, Dr. Craven's assessment several months after the date last insured, Exhibit 10F at 5; Dr. Prophet's records in Exhibit 17F at 14-30; Dr. Craven's findings in 18F at 2, 4, 5, 6-7; and Dr. Sherrer's observations and findings in Exhibit 21F."). The medical record before the Commissioner, including the records first

submitted to the Appeals Council, evidences no complaints of or treatment for foot pain or paresthesias between plaintiff's February 9, 2000 treatment by Dr. David Alford, when he was given arch supports and Zostrix cream, and December 8, 2003, when plaintiff complained to Dr. Morriss of left lower extremity pain persisting for 24 hours. Plaintiff has produced no evidence that he was experiencing symptoms of peripheral neuropathy during the period between his alleged onset date and his date last insured. (R. 408-11, 550-51, 561-64). During this same period, plaintiff's cardiologist noted in annual check-ups in April 2001, April 2002, and April 2003 that plaintiff was stable and doing well from a cardiac perspective, and that he was experiencing no chest pain or tachycardia. Plaintiff did, thereafter, experience angina which resulted in a cardiac catheterization and stent placement in early July 2003. The stent placement apparently alleviated plaintiff's symptoms; at follow-up evaluations on July 31, 2003 and February 2004, Dr. Craven again described plaintiff as stable and without significant cardiac symptoms. The first report of chest discomfort after July 2003 – at least as evidenced in the record – occurred in October 2005, more than two years after plaintiff's date last insured. (R. 314-17, 337, 343-44, 363, 383-84, 394, 418, 430-39, 489, 539-44).

Plaintiff's persistent complaints during the relevant time period related to his asthma. Plaintiff experienced exacerbations of his asthma, some requiring treatment at the hospital and others requiring that he increase his dosage of Predisone, with the worst periods during

the spring and fall of 2001 and 2002, and the spring of 2003.[17] (See Exhibits 17F, 21F; pp.

13-18, *supra*).   However, in assessing plaintiff's RFC, the ALJ relied, in part, on plaintiff's

activities of daily living; the evidence permits a reasonable conclusion that, even when

plaintiff was having more frequent problems with asthma, he remained fairly active.[18]

Additionally, while plaintiff asserts that he is disabled, in part, by fatigue (R. 41, 209-11),

the record evidences only one period during which plaintiff complained to a physician of

---

[17] In his reply brief, plaintiff argues that his asthma "may well equal a listed impairment[,]" noting that the evidence "shows at least four hospital visits for asthma over a one year period[.]" (Plaintiff's reply brief, p. 6). Plaintiff cites the standard for medical equivalence, and quotes the Supreme Court's statement that, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he *must present medical findings equal in severity to all the criteria for the one most similar listed impairment*. Id. at n. 5 (emphasis added)(quoting Sullivan v. Zebley, 493 U.S. 521, 531 (1990)). Plaintiff has not presented such evidence in this case.  The listing for asthma, if implicated on the basis of severe asthma attacks, requires proof of "attacks . . . in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year." 20 C.F.R. 404, Subpart P, App. 1, ¶ 3.03(B). For purposes of the listing, asthma attacks are "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting," and the listing requires medical evidence of the physical signs and, also, "spirometric results obtained between attacks that document the presence of baseline airflow obstruction."  Id., ¶ 3.00(C).  Plaintiff has not, however, produced hospital records of his admissions or ER treatment for asthma, or of spirometric results obtained between attacks, for the relevant time period before his date last insured.  The brief references within the office treatment notes of plaintiff's doctors to earlier hospitalizations or ER visits for asthma are insufficient to establish that plaintiff met or equaled the listing for asthma; plaintiff has not presented evidence that his combination of impairments resulted in  "medical findings equal in severity to all the criteria" of a listed impairment. Zebley, *supra*.

[18] In June 2001, for instance, Dr. Prophet observed that Dr. Prophet indicated "[the plaintiff] had an up and down six months with several mild-to-moderate exacerbations of the asthma, at least one of which required an emergency room visit in April." (R. 502). At that time, plaintiff was driving to Barbour County and spending the night to help care for his mother, and returning home to work at his florist shop. (Id.). In December 2001, Dr. Prophet noted that plaintiff's asthma was aggravated, in part, by "the usual flurry of business activities" and dealing with his mother's health. (R. 501).  In February 2002, Dr. Prophet observed that plaintiff's breathing may have been aggravated by "stress with Valentine's Day activities[.]" (R. 499).

persistent fatigue, from early March through mid-April 2002. (R. 497-98, 567). Upon review

of the evidence of record, the court concludes that the ALJ's RFC determination is supported

by substantial evidence.[19]

Plaintiff argues that the ALJ "erred in failing to consider the mental demands of

[plaintiff's] past work." (Plaintiff's brief, pp. 12-14). Plaintiff rests this argument on a thin

thread of evidence, relying on his hearing testimony that teaching is stressful (R. 34-35), and

Dr. Prophet's notes that stress aggravated plaintiff's asthma and that "stress reduction would

probably help" (R. 499, 501, 502). Dr. Prophet's suggestion that "stress reduction would

probably help" plaintiff's asthma does not equate to a mental limitation from work involving

stress. Dr. Prophet's reference to "stress" does not appear to relate entirely to mental stress

– in May 2004, he observed that the placement of plaintiff's mother and older brother into

a nursing home "reliev[ed] a lot of mental and physical stress on [plaintiff]." (R. 485). His

earlier note reflected that plaintiff was "driving up [to Barbour County] frequently, spending

---

[19] The ALJ erred by relying on the opinion of the disability examiner, as she is not a medical
source. See e.g., Nicholson v. Astrue, 2010 WL 4506997, *6 (W.D.N.C. Oct. 29, 2010)(finding that
attributing weight to the opinion of a non-medical single decision maker ("SDM") is error and
noting that "courts in the nine states where the SDM test model has been practiced have routinely
rejected ALJs' reliance on RFCs created by SDMs"). In this case, the ALJ did not refer to the
disability examiner as a medical source and, although he indicated that he gave her opinion
"significant weight" (R. 16) and that he agreed with her assessment that plaintiff could perform light
work (R. 15), he cited medical evidence sufficient to support his RFC determination (R. 14, 16).
Additionally, as noted previously, plaintiff provided no medical source opinions regarding his
limitations and, accordingly, the ALJ did not credit Easley's non-medical opinion over any medical
opinion. Under these circumstances, the court concludes that the ALJ's error in considering
Easley's opinion is harmless. While the court is puzzled by the ALJ's failure to include
environmental limitations in addition to exposure to heat and cold in the RFC finding, plaintiff's past
work as a secondary school teacher, as that work is performed in the national economy, does not
include exposure to environmental conditions. (See DICOT 091.227-010, attached to plaintiff's
brief). Thus, even if this failure is error, it is also harmless.

the night, helping with her and plus doing his full time job here." (R. 502).[20]  Dr. Prophet's

suggestion for stress reduction cannot fairly be read as an opinion that plaintiff cannot

perform the mental demands of teaching[21] or that he is limited to low-stress jobs and,

accordingly, the ALJ did not err by failing to include a limitation to low-stress work in

plaintiff's RFC.[22]   The court does not read SSR 82-62 to require an express finding or

discussion regarding the mental demands of past work where the claimant's RFC includes

no mental limitations.  See SSR 82-62 ("Adequate documentation of past work includes

factual information about those work demands *which have a bearing on the medically*

*established limitations*.")(emphasis added).

Finally, citing references applicable when a claimant's onset date must be inferred

because of a slowly progressive condition that is non-traumatic in origin, plaintiff contends

that the ALJ was required to call a medical expert to testify at the hearing regarding whether

plaintiff was disabled before his date last insured. (Plaintiff's brief, pp. 14-15)(citations

---

[20]  Plaintiff then resided in Headland, Alabama.  (See *e.g.,* R. 61).

[21]  Dr. Prophet treated plaintiff for asthma for several years before plaintiff's heart attack and
retirement from teaching.  There is no indication in his treatment records for that period of time that
the stress of plaintiff's work as a teacher aggravated plaintiff's asthma. (See Exhibit 17F, R. 516-37).
Rather, the only reference to stress was plaintiff's suggestion that his shortness of breath one night
was due to stress associated with his floral business. (See R. 516)("This [spell of shortness of
breath], he thinks, was just due to stress as his bookkeeper walked out and quit on him that day.  He
had two weddings to do and was just under a lot of pressure.").

[22]  Plaintiff argues that SSR 82-62 "recognizes that individuals with cardiac impairments
'may have performed stressful tasks,' and '[t]his may also require a decision as to whether the
impairment is compatible with the performance of such work." (Plaintiff's brief, p. 13). However,
plaintiff points to no medical source opinion or other medical evidence that – during the relevant
time period, his cardiac and other impairments were incompatible with the mental demands of work
as a teacher.

omitted).  In the present case, however, plaintiff submitted records from his primary care physicians, his pulmonary specialist and his cardiologists for the period up to and following his date last insured.  While plaintiff's cardiac condition and peripheral neuropathy may be slowly progressive conditions, the evidence offered by the plaintiff showed that plaintiff sought no treatment for peripheral neuropathy between his alleged onset date and his date last insured and that plaintiff's cardiologist noted that plaintiff was doing well from a cardiac perspective, with no significant cardiac symptoms, up until just before his heart catheterization and stent placement in early July 2003[23] and that, by July 31, 2003, plaintiff indicated to Dr. Craven that, overall, he was " very content with his current state of health" (R. 539).[24]  Thus, plaintiff responded favorably immediately following his stent placement. The evidence before the Commissioner permitted a conclusion, without the need for medical expert testimony, that plaintiff did not suffer from disabling limitations before his date last insured.

## CONCLUSION

For the foregoing reasons and upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law. Accordingly, the decision is due to be affirmed. A separate

---

[23]  As noted above, plaintiff did not provide the records of his hospital admission in July 2003.  Thus, there is little evidence of the duration or severity of his symptoms leading up to the admission.

[24]  Dr. Prophet's treatment notes, which continue through August 2007, generally reflect that the frequency and severity of plaintiff's asthma symptoms diminished over the four years following his date last insured.  (See Exhibit 17F, R. 475-89).

judgement will be entered.

Done, this 8th day of December, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE